J. Ted Donovan, Esq.
GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Attorneys for the Debtor
1501 Broadway, 21st Floor
New York, New York 10036
(212) 221-5700

UNITED STATES BANKRUPTCY COURT     Return Date: October 8, 2009
EASTERN DISTRICT OF NEW YORK                     10:00 A.M.
-------------------------------------------------------------x
In re:                                                             Chapter 11

CROWN OHIO INVESTMENTS LLC,           Case No. 109-46767-DEM

                               Debtor.
-------------------------------------------------------------x

## DEBTOR'S OPPOSITION TO MOTION FOR
## RELIEF FROM THE AUTOMATIC STAY

**TO THE HONORABLE DENNIS E. MILTON,
UNITED STATES BANKRUPTCY JUDGE:**

        Crown Ohio Investments LLC (the "Debtor") as and for its Opposition to motion of Wells Fargo Bank, N.A. as Trustee ("Well Fargo") seeking relief from the automatic stay, represents and shows this Court as follows:

        1.      Wells Fargo has precipitously moved to lift the automatic stay within the 90 day period afforded to the Debtor under Section 362(d)(3) of the Bankruptcy Code to commence adequate protection payments or file a plan, and within the 120 day exclusivity period fixed in Section 1121(b).

        2.      Moreover, Wells Fargo bases its allegation that the Debtor lacks any equity on an opinion statement from a broker rather than on a written appraisal performed pursuant to MAI guidelines. That this statement should not

be given evidentiary weight is further demonstrated by the fact that the broker, Brian Pace, is based in Dayton, Ohio and demonstrates no experience in or familiarity with the Cleveland real estate market.

3. With the Chapter 11 still in its early stages, it is simply premature and inappropriate to lift the automatic stay, particularly since the Debtor is prepared to make debt service payments to Wells Fargo, and has made a proposal to Wells Fargo in that regard. Moreover, the Debtor submits that the true value of the Debtor's property more than supports Wells Fargo's claim even in this difficult financial environment.

4. In defense of this motion, the Debtor seeks only a fair and reasonable opportunity to restructure its mortgage debt. The Debtor can not reasonably be expected to have all of the answers within such a short period of time. The real question is how best to balance the respective rights and interests of the Debtor and its lender, Wells Fargo, under a framework that establishes certain benchmarks and monitors the Debtor's progress, while making sure Wells Fargo's collateral is adequately protected and preserved.

5. It is respectfully submitted that where, as in this case, there are genuine issues surrounding the overall equity to secure Wells Fargo's lien, the stay should remain in place for a reasonable period of time.

## BACKGROUND

6. The Debtor owns a 90-unit multi-family residential garden apartment complex in Cleveland, Ohio (the "Property").

7.  Currently, the Property is 60% occupied and generates monthly rents of approximately $25,000 per month. When the Debtor acquired the Property in 2007, it was 75% occupied, but many of the tenants were not creditworthy or were already delinquent. Moreover, a prior property manager (since replaced) unfortunately was convicted of criminal fraud involving $20,000 of embezzled rents. This situation not only hurt cash flow, but also hampered operations at the Property because the property manager installed a number of non-performing tenants. It took over a year to finally remove these tenants.

8.  While the overall real estate market has declined, the Debtor still remains hopeful it can improve occupancy levels with creditworthy tenants and eventually emerge from Chapter 11.

9.  When the Debtor purchased the Property in 2007 for $2,400,000, it assumed existing debt through Wells Fargo. Despite the management problems and cash flow shortages described above, the Debtor was able to make its required monthly payments of $14,301.18 through January, 2009. The Debtor defaulted in February, and was seven months in arrears when it filed for Chapter 11 relief on August 7, 2009.

10.  Importantly, Wells Fargo is holding a reserve account in the amount of $71,204.25. Thus, when applied to the outstanding balance of $100,108 due at the time of the filing, the mortgage arrears after application of the reserve are less than $30,000 as against a total mortgage debt of almost $2 million.

## THERE IS NO BASIS TO LIFT THE
## AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)

11.　　Wells Fargo's request to lift the automatic stay is a rush to judgment and raises issues of fact, particularly as to the current value of the Property, and whether the Property is necessary to an effective reorganization and can be adequately protected during the pendency of the case.

12.　　Under familiar principles, 11 U.S.C. § 362(d)(2) permits the stay to be modified with respect to specific property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."

13.　　Wells Fargo bases its claim of a purported lack of equity, alleging that the Property only has a value of $900,000 to $1,300,000 based on a recently prepared statement by Brian Pace, without any reference to the formal written appraisal prepared for Wells Fargo prior to the sale in 2007, which showed the Property to be worth $2,700,000. A copy of the 2007 appraisal is annexed hereto as Exhibit "A".

14.　　While the Property has doubtless suffered some decline in value in the current financial downturn, the Debtor submits that the current fair value is still greater than the $1.9 million owed to Wells Fargo. Indeed, it is noteworthy that Wells Fargo has chosen to submit Mr. Pace's statement rather than to obtain an update of the prior formal appraisal.

4

15. This is of primary importance, as the written declaration of Brian Pace is <u>not</u> a formal appraisal performed pursuant to MAI guidelines, but rather is merely an opinion letter from a real estate broker. Further, as noted above, the broker in question is headquartered in Dayton, Ohio, and does not include any evidence of familiarity with Cleveland in general, let alone the neighborhood in which the Property is located.

16. Tellingly, Mr. Pace includes in his opinion letter comparable sales from Indianapolis, Dayton, Cincinnati and Columbus, without one single comparable sale from Cleveland.

17. Mr. Pace's statement is replete with questionable assumptions and is remarkably dissimilar to the formal 2007 appraisal, without any explanation or analysis of the differences.

18. For example, on page 15, Mr. Pace asserts without any explanation that the sale price per unit is between $10,000 and $16,667. In the 2007 appraisal, there is a detailed analysis, summarized in the chart on page 53, as to why the sale price per unit is $30,000.

19. Similarly, on page 15 of his statement, Mr. Pace alleges without any explanation that a capitalization rate of between 11.08% and 11.34% should be used in valuing the Property. Pages 67-67 of the 2007 appraisal contain a full explanation that the correct capitalization rate is 10%, with examples from comparable apartment buildings in the same area. A lower capitalization rate would increase the estimated value of the Property significantly.

20. Another example of questionable assumptions is found on pages 30 and 35, where Mr. Pace estimates operating expenses at around $350,000. The 2007 appraisal not only estimates the annual expenses at only $285,845 (p. 65) but shows that the actual expenses incurred by the prior owner were $221,945 in 2006 and $177,045 in 2007 on an annualized basis (p. 57).

21. Thus, Mr. Pace's statement is unsupported and open to serious question. When set against a debt of less than $2,000,000 owed to Wells Fargo, and pre-petition arrears of only about $30,000 after application of the reserve fund, it is clear that the secured claim of Wells Fargo is fully protected.

22. Wells Fargo also includes a statement prepared by Nova Consulting setting forth over $222,000 in repairs alleged to be needed immediately. First, this amount is directly contradicted by Mr. Pace's statement, which on pages 9-10 discusses these same maintenance issues without reference to any need for "immediate" repairs, and estimates the total cost at only $180,000, a figure which the Debtor believes is itself too high.

23. For example, at the beginning, the Debtor was expending substantial sums to redecorate the apartments it was bringing into the rental market. As the Debtor has since come to realize, these are low income apartments which do not require the installation of state of the art appliances or fancy carpets, and can be renovated at a fraction of the estimated cost.

24. Moreover, as low income housing, the parking lot repairs are not nearly as important as if this were a luxury dwelling, and thus, while the repairs are needed they are not needed on an "immediate" basis.

25. Novo attempts to alarm by classifying the need to repair balcony railings as "a life and safety issue that warrants immediate inspection." (p. 3). In fact, the Property has been inspected by the City of Cleveland several times since the 2007 purchase, and no violations have ever been noted by the City on account of the balconies. Further, the railings are easily and inexpensively replaced as each vacant apartment is readied for rental, at a total aggregate cost estimated by the Debtor at less than $5,000 for the entire Property.

26. Thus, the so-called "immediate repairs" are little more than the usual repairs and maintenance one expects to find in a debtor in possession property where funds are tight, but health and safety are not placed in jeopardy.

27. Importantly, even as the parties debate equity, there can be no disputing that the Property is essential to an effective reorganization. It constitutes the Debtor's sole asset. In this regard, the Debtor understands the Supreme Court admonition that an effective reorganization typically means that "there must be a reasonable possibility of a successful reorganization within a reasonable time. <u>United Savings Association v. Timbers of Inwood Forest Associates, Ltd.</u>, 484 U.S.365, 375-76, 180 S.Ct. 626 (1987). However, the Supreme Court also noted that when the motion is made in the early stages of the case, prior to the

termination of exclusivity, the courts "demand less detailed showings" of reorganization prospects. Id. at 376.

28. Here, Wells Fargo argues that the Debtor cannot meet its burden that the Property is necessary to an effective reorganization because the Debtor has no equity in the Property. This is non-sequitur. Even without equity, the Debtor is still capable of negotiating a plan with other creditors and, perhaps, cramming down or stripping Wells Fargo's lien under § 506(b).

29. Operationally, the Debtor has a reasonable prospect of resurrecting its cash flow to the point where it can better address the mortgage debt, by the simple act of raising its tenancy rates from the current 60%. In this regard, it is telling that the six comparable rental properties cited in Mr. Pace's statement have occupancy rates between 80% and 99%, evidencing that achieving a higher occupancy rate is not limited by uncontrollable factors in the local Cleveland market. Rather, it is evidence of the need for the Debtor for have an opportunity to stabilize its marketing to increase its occupancy rates.

30. It should be noted that Wells Fargo has contributed to the Debtor's problems in increasing rentals, because a small but significant portion of income in a low rent apartment building like the Debtor's would normally be expected to be received from Section 8 housing assistance. However, once the foreclosure action was commenced, Section 8 refused to permit any new tenants to lease with the Debtor. If Wells Fargo would withdraw the foreclosure action, the

Debtor would be able to take immediate advantage of the increased occupancy and stabilization of monthly rent payments which Section 8 can produce.

31. The Debtor also contends that it can continue to improve its efforts to control expenses, to a point where the expenses are far below the estimates in Mr. Pace's statement, further increasing operating profits.

32. In short, there is a myriad of possibilities short of foreclosure - it is far too early to make a finding that this Debtor will never be able to confirm a plan.

WHEREFORE, for all of the reasons set forth herein, Wells Fargo's motion should be denied consistent with the foregoing, together with such other and further relief as is just and proper.

Dated: New York, New York
October 6, 2009

GOLDBERG WEPRIN
FINKEL GOLDSTEIN LLP
Attorneys for the Debtor
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By: _____
J. Ted Donovan, Esq.